UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA              CRIMINAL NO. 16-cr-00042(01) & (02)

VERSUS                                JUDGE FOOTE

RUSTIN J. STEIN (01) and              MAGISTRATE JUDGE HORNSBY
JAMES LEE ADKINS (02)

## REPORT AND RECOMMENDATION

### Introduction

Defendants Rustin Stein and James Adkins are charged with conspiracy to distribute methamphetamine and possession of methamphetamine with intent to distribute.  The drugs were found during a traffic stop which resulted from both an on-going drug investigation and a traffic violation.   Before the court are Defendants' **Motions to Suppress**.  **Docs. 38, 39, and 40**.  Defendants argue that the stop and search were illegal and that all drugs, statements, and other evidence discovered should be suppressed.  For the reasons that follow, it is recommended that Defendants' motions be **denied**.

### Factual Background

The evidentiary hearing established the following facts.  The DEA was investigating defendant Rustin Stein's drug trafficking activities, and had previously made a purchase of methamphetamine from her. Tr. 44, 54.  To assist the DEA in tracking Stein and identifying her source of supply, the court issued a GPS tracking warrant for Stein's cell phone.  The

Government learned that Stein was driving a rental car while her vehicle was in the shop for repairs.  The agents also believed that Stein's source of supply was in Dallas.

On February 8, 2016, while monitoring Stein's cell phone location, agents observed her traveling westbound on I-20 toward Dallas, Texas.  The agents later contacted a Dallas narcotics officer, who drove past a residence in Dallas and saw Stein's rental vehicle at that location.  The Dallas officer confirmed that the home was the residence of a known drug distributor.  Tr. 48, 52, and 53.  The DEA agents requested assistance from the Louisiana State Police so that a traffic stop could be made when Stein's vehicle returned to Louisiana.

Louisiana State Police Trooper Brent Peart and his canine handler back-up Trooper Roger Cason were called on duty to wait for Stein's vehicle to cross the state line.  While the DEA had reasonable suspicion that Stein's vehicle contained methamphetamine purchased in Dallas to be resold in Shreveport, they did not have probable cause.  Tr. 54.  The state police were told they would have to develop their own probable cause to stop Stein's vehicle. Tr. 32-33.

Trooper Peart observed Stein's rental car heading east on I-20 after crossing the state line.  Peart was in the left lane following the rental car when he decided to make a traffic stop for following too closely behind another vehicle.  Peart testified that Stein's vehicle was within one or two car lengths of another vehicle traveling at about 70 miles per hour.  Peart noticed the traffic violation almost immediately after catching up to the rental vehicle, but for safety reasons he decided not to stop the vehicle until after it passed an upcoming rest area.  Tr. 10-11.

Peart testified that he normally allows vehicles traveling 70 miles an hour to follow within five or six car lengths.  If vehicles are traveling at one to two car lengths at that speed, and someone slams on the brakes, there is no time for the following vehicle to react.  The following vehicle is "going to go right in the rear end of that [other] vehicle."  Tr. 13-14. Peart acknowledged that he exercises discretion on which vehicles to stop for following too closely.  Peart also admitted that if he tried to stop everyone on the interstate who was following too closely, he would make those stops all night long.

After initiating the stop, Peart approached the driver's side of the vehicle and asked the driver, defendant James Adkins, to step outside.  Peart shook Adkins' hand, which Peart noticed was real sweaty.  Adkins seemed very nervous, and he avoided eye contact as he tried to answer even the most basic questions.  Adkins was also very vague on his travel itinerary.  He stated he was coming from a mall, but he could not say where in Texas the mall was located.  Tr. 5.  Peart asked Adkins who owned the vehicle that he was driving, and Adkins did not seem to know.  He pointed to the passenger (Stein) and indicated that it belonged to her.  Tr. 6.  He said they traveled to Dallas earlier that evening.

Peart then approached the passenger's side of the vehicle.  The passenger, defendant Stein, pretended to be asleep, which was unusual because Peart had observed the occupants of the vehicle talking when he initially approached it.  Stein stated that she did not have a driver's license because it was stolen from her a few days prior.  She said the vehicle was rented, but she could not provide a rental agreement or even the last name of the person who rented the vehicle for her.  Stein also told Peart that she and Adkins had traveled to Dallas

the day before.  This contradicted Adkins' statement about Stein and Adkins arriving in Dallas earlier that evening.   Peart noticed the smell of air freshener coming from inside the vehicle, which he associated with the smuggling of narcotics.

Peart returned to his patrol car and ran Stein's and Adkins' driver's  licenses to check for warrants and criminal histories.  Both had histories related to narcotics.  Tr. 8.  There were no warrants for Adkins or Stein, although Adkins was driving with a suspended license and Stein had no license in her possession.

In light of the information obtained from DEA regarding suspected drug trafficking and in light of the other circumstances presented during the stop, Peart sent an  instant message via computer to his canine backup, Trooper Roger Cason.  Cason arrived at the traffic stop within about one minute.  Tr. 8.  Once Cason arrived, Peart approached Adkins and asked him for consent to search the vehicle.  Adkins refused, because it was not his vehicle and he felt like he did not have the right to grant consent.  Peart then immediately asked Trooper Cason to use his canine ("Rico") to conduct an open-air search around the exterior of the vehicle.  Rico is certified through the National Police Canine Association on marijuana, cocaine, heroin, methamphetamine, and ecstasy.   Tr. 28.   Rico alerted immediately on the rear driver's side door.  When the officers searched that area, they found nearly one pound of methamphetamine in a shoe box on the rear seat near the rear driver's door.  Tr. 42.

Defendants were placed under arrest and taken to the DEA office in Shreveport.  The agents attempted to interview Adkins, but he acted incapacitated and incoherent.  He made

no incriminating statements.  Stein signed an advice of rights form (Government Exhibit 1) and waived her rights.  Tr. 47.  She told the agents that she and Adkins went to Dallas to meet her source of supply to pick up the methamphetamine.  Tr. 48.  The agents also obtained Stein's consent to review the information in her cell phone.  That information confirmed what she had told the interviewers about who she was supplying.  Tr. 49.  The rental car agreement was later obtained by the Government (Government Exhibit 2), and neither Adkins nor Stein were authorized drivers of the vehicle.

**Law and Analysis**

### Standing

Both Defendants have standing to  challenge the constitutionality of the traffic stop.  United States v. Martinez Alvarez, No.  2012 WL 4863212, at *2 (M.D. La. Oct. 12, 2012).  But the Government argues that neither Adkins nor Stein were authorized drivers of the rental car and, therefore, they lack standing to complain about the search of the vehicle. As to Adkins, it seems clear that he has no standing with respect to the search.  The Fifth Circuit has recognized that "passengers who assert[ ] neither a property nor a possessory interest in the automobile that was searched, nor any interest in the seized property, ha[ve] no legitimate expectation of privacy entitling them to the protection of the [F]ourth [A]mendment."  Iraheta, 764 F.3d at 461 (5th Cir. 2014); United States v. Greer, 939 F.2d 1076, 1093 (5th Cir.1991).  Adkins does not assert any interest in the rental vehicle or the drugs, so he cannot challenge the search of the vehicle.  See, e.g., United States v. Alexis, 2016 WL 1060312 (S.D. Fla.)(driver of rental car, who had a suspended license and was not an authorized driver

of the rental car, did not have an objectively reasonable expectation of privacy in that car, despite the fact that the renter and the authorized driver of the car had given defendant permission to use the car).

The standing issue is somewhat closer with regard to Stein. The DEA agents knew that Stein had been driving that vehicle while her personal vehicle was in the shop for repairs. The car was not reported stolen, so apparently Stein was using it with permission of the car's authorized driver. Nevertheless, the rental agreement explicitly prohibits the renter to authorize other drivers to operate the vehicle. Gov. Ex. 2.

The court need not decide these motions on standing. As shown below, neither the traffic stop nor the subsequent search violated the constitution.

**The Traffic Stop**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 2014 WL 6065297, at *4-5 (5th Cir. Nov. 14, 2014); United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about

to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir.2005). "Reasonable suspicion" analysis requires assessing the totality of the circumstances to ascertain the reasonableness of the suspicion. United States v. Powell, 732 F.3d 361, 369 (5th Cir.2013) (citation omitted). This is consistent with the "touchstone of Fourth Amendment analysis [being] reasonableness", which "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

The Supreme Court held unanimously in Whren v. United States, 517 U.S. 806 (1996): "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810. "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." United States v. Zavala, 541 F.3d 562, 575 (5th Cir.2008) (quoting United States v. Castro, 166 F.3d 728, 733 (5th Cir.1999) (en banc)). Therefore, probable cause to make a traffic stop exists, *inter alia*, when a defendant commits a traffic violation and a law-enforcement officer observes the violation. United States v. Khanalizadeh, 493 F.3d 479, 482 (5th Cir.2007).

"The rule established by the Supreme Court in Whren allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop", United States v. Cole, 444 F.3d 688, 689 (5th Cir.2006). The legal justification for the traffic stop must simply be "objectively grounded." Id.

Terry's first prong is easily met in this case.  The collective knowledge of the agents and troopers amounted to reasonable suspicion that the rental car used by Stein was carrying methamphetamine from Dallas to Shreveport.  The DEA agents had already made a purchase of methamphetamine from Stein, they knew she was driving the same rental car, and they knew the car was driven that day from Shreveport to the Dallas home of a known drug distributor.  These facts readily distinguish this case from United States v. Spears, 2016 WL 279020 (5th Cir.), where the court did not find reasonable suspicion of drug trafficking based on the defendant's presence at a known drug house where neither the defendant nor his vehicle were known to the officers before the visit to the drug house.

Trooper Peart also had his own justification—aside from the reasonable suspicion regarding drug trafficking—to stop the rental car.  He personally saw the driver of the vehicle commit a traffic violation by following another vehicle much too closely (about one car length instead of six or seven car lengths at 70 m.p.h.)  Despite Defendants' arguments about Peart's discretion in making similar stops and the vagueness of the statute — all of which are without merit — Peart lawfully initiated the stop.

Defendants suggest that Peart's testimony about his reason for the stop is not credible.  They surmise that Peart was going to stop the rental car no matter what — even if no traffic violation was observed.  Defendants also point out that Peart did not include in his report on the stop any hint that the stop was made on information provided by DEA in connection with a drug investigation.

While it seems odd that Peart would not include such information in his report, his decision not to do so does not destroy his credibility about the traffic stop.  Peart testified that he usually does not include similar information in reports in other cases, based on his assumption that the narcotics agents will incorporate his information into an overall report. However, not including all of the relevant information, including tips passed along from other officers or agents, unnecessarily creates suspicion in the minds of defendants and their counsel that key information is being withheld from them.  In this case, the information was not withheld; it was produced in other discovery.  It just was not in Peart's report.

As to <u>Terry</u>'s second prong, whether the officer's actions were reasonably related in scope to the circumstances that justified the stop, an officer's subsequent actions are not reasonably related in scope to the circumstances that caused the officer to stop the vehicle if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. <u>Brigham</u> at 506.   If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. <u>Id</u>.; <u>United States v. Aguilera</u>, No. 2014 WL 7404535, at *3 (N.D. Tex. Dec. 30, 2014).

The Fifth Circuit has held that an officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop.  <u>United States v. Pack</u>, 612 F.3d 341, 349-350 (5th Cir.

2010). The officer may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. Additionally, the Fifth Circuit has held that an officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as these unrelated questions do not extend the duration of the stop. Id. The reasoning behind this rule is that the Fourth Amendment protects against detention, not questioning. Id. Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be processed. Id.

Trooper Peart acted promptly and professionally in investigating the reasonable suspicion of drug trafficking that arose before the stop and after the stop.  As soon as Peart made contact with the driver, Peart noticed that Adkins was visibly nervous, his hand was sweaty, and he would not make eye contact when answering basic questions.  He did not know who owned the car, but indicated the car belonged to Stein.  He was vague about their travel itinerary.  His driver's license was suspended.

When Peart approached Stein, she tried to pretend she was asleep.  She had no identification and could not produce the rental agreement for the car.  Her description of the itinerary, including which day they arrived in Dallas, was different from Adkins' version.

Peart ran Defendants' names through the system and learned they had prior drug histories.  He then decided to seek consent to search the car.  He sent a message to Trooper Cason, who was close by and arrived in about one minute.  When Adkins refused consent to

search, Cason led his canine around the car, and the dog immediately alerted on the right rear door.  The canine alert gave rise to probable cause to search the vehicle, United States v. Williams, 69 F.3d 27, 28 (5ᵗʰ Cir. 1995), which resulted in the discovery of the drugs.

### Stein's Statements and Cell Phone

Stein also challenges her post-arrest statements and the search of her cell phone. (Adkins made no statements.) The evidence at the hearing refutes Stein's arguments that her statements were not made freely and voluntarily.  She signed the Miranda warning (Govt. Ex. 1) and freely spoke to the agents.  She was not under duress or coercion.  She was very cooperative.  She also freely granted consent for the agents to review her cell phone information.  There is no lawful basis to suppress her statements or the information in her cell phone.

### Conclusion

The traffic stop was based on reasonable suspicion that Defendants' vehicle was carrying illegal drugs from Dallas to Shreveport.  The stop was also based on probable cause that Defendants' vehicle was following another vehicle much too closely.  Based on the additional reasonable suspicion that developed during the stop, Trooper Peart was well within the Fourth Amendment to inquire further and ask for consent to search.  When Adkins refused to consent to a search, Trooper Peart properly instructed Trooper Cason to walk his canine around the vehicle.   The canine alerted, and the drugs were found pursuant to a lawful search.  All of these events happened within a few minutes, with no unwarranted delays.

There is no fruit of the poisonous tree in this case.  All of the evidence located in the rental car and on Defendants' persons (small amounts of drugs in their pockets, ledgers, etc.), as well as Stein's statements to the agents and the contents of her cell phone, should be admitted.

Accordingly;

**IT IS RECOMMENDED** that Defendants' Motions to Suppress (Docs. 38, 39 & 40) be denied. Signed on July 13, 2016.

Mark L. Hornsby
U.S. Magistrate Judge